## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| XCELERATED TRANSPORTATION GROUP, LLC<br>        Plaintiff, | §<br>§<br>§<br>§ | |
| VS. | §<br>§ | CIVIL ACTION NO.  _____ |
| NAVISTAR, INC.,<br>        Defendant. | §<br>§<br>§ | |

### PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, Xcelerated Transportation Group, LLC ("Plaintiff") makes and files this Complaint against Defendant Navistar, Inc. (hereinafter referred to as "Navistar") and in support would respectfully show unto the Court the following:

### I.

### PARTIES AND JURISDICTION

1.      Plaintiff is a domestic corporation incorporated under the laws of California with its principal offices located in Stockton, CA.

2.      Defendant Navistar is incorporated under the laws of Delaware, with its principal office in Texas located in Garland, Dallas County, Texas.

3.      Jurisdiction in proper in this Court pursuant to 28 U.S.C. § 1332 in that (i) the amount in controversy exceeds the sum of $75,000.00, excluding interest and costs and (ii) the parties are citizens of different states.

### II.

### FACTUAL BACKGROUND

4.     Plaintiff is a logistics company and owner of a commercial Trucking fleet and is engaged in business across 48 states.

5.     Navistar is a corporation that manufactures trucks and other equipment.

6.     Navistar manufactures International brand ("International") heavy-duty commercial trucks and MaxxForce brand ("MaxxForce") diesel engines.

7.     Non-parties Interstate International, Gibbs International, Hanson International and Navistar UTC sell and service Navistar trucks and equipment including International trucks and MaxxForce diesel engines.

**Defendant's Authorized Dealer Distribution Network**

8.     Navistar provides a package of goods and services to buyers of International trucks with MaxxForce engines by distributing their products through a nationwide network of authorized dealers (the "Navistar Network").

9.     Authorized dealers in the Navistar Network – such as Non-parties Interstate International, Gibbs International, Hanson International and Navistar UTC - act as agents for Defendant in connection with the purchase and service of International trucks with MaxxForce engines.

10.     Upon information and belief, dealers in the Navistar Network rely almost exclusively on materials and training received from Defendant when making representations about International trucks and MaxxForce engines to their customers.

11.     Defendant Navistar regularly provides authorized dealers with International and MaxxForce branded literature, signage, and training materials for use in promoting, selling and financing the purchase of their trucks to customers.

12.     In addition, Defendant Navistar routinely holds training seminars for authorized dealers in the Navistar Network.

13.     During these seminars, Defendant Navistar coaches dealers in the Navistar Network and their sales staff on the best ways to sell International trucks to customers, including providing detailed comparisons of competing manufacturers' products and outlining the specific information dealers should emphasize when pursuing a sale.

14.     In areas where they lack knowledge, dealers in the Navistar Network are encouraged to visit Navistar's website for additional information.

15.     Potential Navistar customers are also encouraged to visit Navistar's website when seeking information about International trucks and the MaxxForce engine.

16.     Navistar's website contains informational materials and statements to aid dealers and induce the customer to purchase Defendant's products.

17.     In addition, Defendant Navistar furnishes the actual specifications of each Trucks including fuel efficiency information, rather than relying on the dealers to generate those details for customers interested in purchasing International Trucks.

18.     Upon information and belief, Defendant Navistar intends for dealers in the Navistar Network to rely almost exclusively on information provided by Defendant Navistar when making representations to potential customers and inducing customers to purchase International Trucks with MaxxForce engines.

19.     Between September 2011 and August 2013, Plaintiff purchased ten (10) International ProStar on-highway semi-trucks ("Trucks"), from Defendant Navistar.

20.     At the time of purchase, the Trucks were warranted by Defendant Navistar, both expressly in writing, and orally by Defendant's agents and representatives, including Non-parties

Interstate International, Gibbs International, Hanson International and Navistar UTC, to be free from defects in design, material and workmanship. At the time of purchase, Navistar's agents and representatives assured Plaintiff that the Trucks were in perfect working order and without defects.

21.     However, not long after the purchase of the Trucks Plaintiff began to experience numerous breakdowns of its Trucks, specifically the EGR system, EGR coolers, EGR valves, and other components of the Trucks and engines. Non-party Interstate International was an agent for Navistar and assisted in the repairs of the Trucks.

22.     Subsequently, Plaintiff's Trucks went into service shops, including Non-party Interstate International, to repair problems directly related to these systems and components.

23.     Despite numerous attempts to correct the Trucks problems by Defendant Navistar and Non-party Interstate International, Defendant has failed to adequately correct the problems.

24.     Plaintiff was led to believe that each repair or remedy would solve the defect; however Plaintiff's Trucks continued to be defective.

**Defendant's Representations**

25.     Defendant Navistar, through its agents, including Non-parties Interstate International, Gibbs International, Hanson International and Navistar UTC, and through advertising materials and public statements in trade magazines, repeatedly made representations concerning their unique exhaust gas recirculation ("EGR") emission system on the MaxxForce 13-litre engine.

26.     According to representations made to Plaintiff, Navistar's proprietary EGR system was purportedly certified under the Environmental Protection Agency's ("EPA") 2010 emissions standards for use on heavy-duty commercial trucks.

27.     Based on their public statements and press releases, it appeared that Defendant Navistar was attempting to distinguish itself from competitors by becoming the only heavy-duty truck manufacturer in North America to rely entirely on EGR to meet the EPA 2010 emissions standards.

28.     Defendant Navistar's EGR system recirculates the exhaust gas produced by the engine back into the engine to be re-combusted.

29.     Other heavy-duty commercial trucks manufacturers in North America use a combination of EGR and selective catalytic reduction ("SCR"), which requires injecting a chemical after-treatment—a urea based compound known as DEF—into the exhaust gas once it leaves the engine, thereby neutralizing and/or reducing harmful emissions.

30.     Defendant Navistar was the only manufacturer of heavy-duty commercial trucks in North America that relied entirely on EGR to meet EPA emissions standards.

31.     According to representations made by Defendant Navistar and Non-parties Interstate International, Gibbs International, Hanson International and Navistar UTC, the EGR system purportedly provides better "fluid economy" than other brands' combination SCR systems because EGR does not require the use of an after-treatment to neutralize harmful emissions—an additional operating cost that each fleet owner or Trucks driver would have to bear.

32.     Defendant also represented that the MaxxForce ProStars would deliver the "lowest cost of ownership" including minimal downtime as a result of breakdowns of the engine and emissions systems.

33. Defendant Navistar also represented that its engines had met the EPA 2010 emissions standards of .2g NOx and were the only heavy duty engine manufacture able to do so inside the cylinder.

34. However, based upon information and belief, Defendant Navistar engines never reached the EPA 2010 emissions .2g NOx standards threshold and Defendant Navistar knew that the engines were never going to meet this requirement using EGR only technology.

35. Additionally, as discussed below, Defendant Navistar's EGR system was flawed and became one of the most significant and consistent problems with the Trucks.

36. Throughout the course of negotiations, and through advertising materials and trade magazines reviewed by the Plaintiff, Defendant made several other representations to Plaintiff that proved to be untrue.

37. Defendant assured Plaintiff that the Trucks were free from defects and suitable to perform the duties for which it was manufactured.

38. However, if Plaintiff did experience problems with the Trucks' operation, Defendant assured Plaintiff that the expansive Navistar Network would make its certified technicians and quality parts available if repairs were necessary.

39. Defendant further represented to Plaintiff that all authorized dealers in the Navistar Network have MaxxForce ProStar certified technicians on staff and available at all times.

40. Defendant also touted their optional "OnCommand" service, which was purported to reduce downtime by communicating with repair departments in the Navistar Network to schedule parts deliveries, alert technicians, and provide troubleshooting support, all before a disabled Trucks is delivered for repairs.

41.    Defendant represented to Plaintiff that MaxxForce ProStars are designed and built to maximize uptime, minimize downtime, and be "always performing."

42.    Defendant represented that MaxxForce ProStars had millions of miles of actual road testing and years of simulated testing to provide road-ready Trucks from the day of purchase. Navistar claimed this testing had solved any serious issues or defects with the design, the components, the materials, and the workmanship of the system prior to officially launching the vehicle in 2010.

43.    Non-parties Interstate International, Gibbs International, Hanson International and Navistar UTC, acting as Defendant's agent, relayed much of the above-described representations directly to Plaintiff.    This information was also relayed in advertising materials and trade magazine interviews with Navistar employees.

44.    Upon information and belief, Plaintiff asserts that Defendant Navistar made the above representations either directly or through Non-parties Interstate International, Gibbs International, Hanson International and Navistar UTC, with the intention of inducing Plaintiff to purchase the Trucks.

45.    According to their public filings, Defendant spends close to $30 million per year on advertising intended to reach customers and induce them to purchase Defendant's products.

46.    Persuaded by Defendant's representations reflected herein Plaintiff purchased the Trucks.

47.    Upon information and belief, one of the most significant problems with Defendant's EGR system is that the continuous recirculation of exhaust gas back into the engine reduces the engine's efficiency, causes soot, which all adversely affect the components of the EGR system and engine.    The material used in the EGR system and engine was not able to

withstand the excessive soot and heat. The workmanship failed to provide an EGR system and engine that could handle excessive heat and soot. The design of the EGR system could not handle the excessive heat and soot.

48.     Plaintiff was repeatedly forced to take the Trucks in to the Navistar Network for repairs due to indications that the engine was overheating, derating and had clogging up of various components.

49.     Plaintiff's trucks were in the shop for warrantied repairs on numerous occasions, not including other routine maintenance required for commercial heavy-duty Trucks.

50.     The problems Plaintiff experienced with the Trucks that required taking the Trucks into the Navistar Network for repairs included, but are not limited to:

a.     Repeated instances of check engine lights illuminating;

b.     Engine derating;

c.     EGR system failure, including but not limited to:

    i.     EGR sensor failure;

    ii.     full replacement of the EGR valve and cooler system;

    iii.     cooling system failures causing the engine to overheat;

    iv.     other problems or failures specifically related to the EGR system;

    v.     EGR plugging;

    vi.     EGR cracking/leaking;

    vii.     EGR valve problems;

    viii.     Turbo failures; and

    ix.     Need for recalibration

d.     Fuel pump failures;

e. A/C blower and compressor failures;

f. Hoses and connections becoming clogged or prematurely worn;

g. Other issues that prevented the Trucks from functioning as warranted.

51. To compound the problem, Plaintiff was repeatedly delayed in getting the Trucks back into operation after they had been in the shop for maintenance and/or repairs, by Defendant's inability or unwillingness to promptly provide certified technicians and necessary parts at service locations in the Navistar Network.

52. Based upon information and belief, on many occasions the parts needed to complete the repairs to Plaintiff's Trucks were on national back order and/or unavailable which contributed to the substantial delays in the repairs.

53. Further, although Plaintiff paid extra for Defendant's coveted OnCommand service, when utilizing OnCommand, Plaintiff experienced little, if any, real benefit and realized no discernible decrease in the time the Trucks were down for repairs.

54. In fact, on several occasions Plaintiff was forced to wait days for necessary repairs.

**Defendant's Knowledge of Problems with MaxxForce ProStars and MaxxForce engines**

55. Upon information and belief, prior to Plaintiff's purchase of the Trucks, Defendant became aware that the MaxxForce ProStar Trucks line was woefully inadequate for public distribution.

56. According to industry standards, heavy-duty commercial Trucks engines require extensive testing for years before public distribution in order to work out any issues with design, material defects and/or workmanship.

57.     Manufacturers of heavy-duty commercial Trucks engines run the engines in controlled conditions for thousands of hours in order to simulate actual driving conditions. Manufacturers are also required to run extensive field or "real world" testing.

58.     As a result of this extensive testing, manufacturers obtain large amounts of data regarding problems associated with the engine performance.

59.     Upon information and belief, Defendant was able to accurately predict the exact types of problems that would occur with MaxxForce engines.

60.     Upon information and belief, Defendant knew that the MaxxForce ProStars had significant and documented problems associated with the MaxxForce engines and concealed this information from the public and Plaintiff. Further, upon information and belief, Defendant did not adequately and thoroughly test its engines prior to release.

61.     Upon information and belief, Defendant Navistar knew that the MaxxForce engines never met the .2g NOx threshold in a commercially viable "real world" setting, and never would and concealed this information from the public and Plaintiff.

62.     Upon information and belief, Defendant Navistar knew as early as 2010 that its EGR-only technology was "still maturing" and concealed this information from the public and Plaintiff.

63.     Upon information and belief, Defendant Navistar knew that by mid-2011 the MaxxForce engines were experiencing significant warranty claims increases and concealed this information from the public and Plaintiff.

64.     Upon information and belief, Defendant Navistar knew that it was only able to sell MaxxForce engines using "banked" emissions credits and concealed this information from the public and Plaintiff.

65.    However, in February 2012, Defendant Navistar ran out of "banked" emissions credits and was notified by the EPA that it would be fined as much as $37,500 per violation, or up to $285 million, for shipping thousands of back-dated engines during the 2010 engine transition.

66.    Nevertheless, upon information and belief, Defendant Navistar proceeded to manufacture and distribute the MaxxForce ProStars while continuing to make false representations to the public and to Plaintiff regarding the performance capabilities, reliability, EPA certification, and Defendant Navistar's commitment to the MaxxForce engine that Defendant knew to be false.

67.    Finally, in July of 2012, Defendant made a public announcement that they were no longer going to produce 11-liter and 13-liter engines with EGR-only systems, but rather they would be switching to combination SCR systems. Defendant also announced that they were ceasing production entirely on their EGR- only 15-liter engine.

68.    As a result of the above-described acts and/or omissions, Plaintiff was forced to institute this legal proceeding to recover for their injuries resulting from Defendant's breach of warranty (including all warranties provided to Plaintiff at any time by Navistar), breach of contract, fraud, and conspiracy in connection with the purchase of the Trucks.

69.    As a direct and proximate result of Defendant's above-described conduct, Plaintiff suffered financial loss and other damages within the jurisdictional allowances of this Court, including, but not limited to:

      a.    Loss of profits;

      b.    Downtime expenses and losses;

      c.    Diminished resale value on the Trucks;

d.    Out-of-pocket repair expenses;

e.    Fuel expenses incurred in excess of the represented amounts;

f.    Towing expenses;

g.    Lodging expenses for Plaintiff's drivers;

h.    Rental car expenses, including fuel for same;

i.    Unreimbursed driver downtime;

j.    Loss of revenue; and

k.    Other economic, financial, consequential and incidental damages allowed
      by law or equity.

## III.

## CAUSES OF ACTION

70.    Plaintiff incorporates the factual allegations described above by reference for the causes of action below.

## BREACH OF EXPRESS WARRANTY

71.    Plaintiff brings a cause of action for breach of an express warranty against Defendant Navistar for representing to Plaintiff that the Trucks were of a particular quality when, in fact, they were not.

72.    Defendant Navistar produced and manufactured the Trucks, which were ultimately sold to Plaintiff.

73.    During the negotiations leading up to purchasing the Trucks, Defendant made the above described representations through its agent to Plaintiff.

74.    Defendant expressly assured Plaintiff that the Trucks were free from defects and was suitable to perform the duties for which they were manufactured and sold.

75.     Defendant Navistar expressly assured Plaintiff they had an extensive network of service centers that would promptly provide parts and trained technicians needed to fix any problems experienced by Plaintiff with the Trucks.

76.     Plaintiff relied on the above-described representations from Defendant in making its decision to purchase the Trucks.

77.     Plaintiff repeatedly notified Defendant and their agents of the defects related to the Trucks and their MaxxForce engines, but Defendant failed and/or refused to make repairs sufficient to correct the defects.

78.     As a proximate result of Defendant's breach of express warranty (all warranties provided to Plaintiff at any time by Navistar), Plaintiff has suffered financial loss and other damages within the jurisdictional allowances of this Court, including, but not limited to:

      a.    Loss of profits;

      b.    Downtime expenses and losses;

      c.    Diminished resale value on the Trucks;

      d.    Out-of-pocket repair expenses;

      e.    Fuel expenses incurred in excess of the represented amounts;

      f.    Towing expenses;

      g.    Lodging expenses;

      h.    Rental car expenses, including fuel for same;

      i.    Unreimbursed driver downtime;

      j.    Loss of revenue; and

      k.    Other economic, financial, consequential and incidental damages allowed by law or equity.

## BREACH OF IMPLIED WARRANTY

79.     In addition, or in the alternative, Plaintiff brings a cause of action for breach of an implied warranty against Defendant for representing to Plaintiff that the Trucks were of a particular quality when, in fact, they were not.

80.     Defendant Navistar produced and manufactured the Trucks, which were ultimately sold to Plaintiff.

81.     During the negotiations leading up to purchasing the Trucks, Defendant through its agent made the above described representations to Plaintiff.

82.     Defendant impliedly assured Plaintiff that the Trucks were free from defects and was suitable to perform the duties for which they were manufactured and sold.

83.     Further, Defendant impliedly assured Plaintiff that the Trucks were merchantable.

84.     Plaintiff ultimately discovered that the Trucks were not merchantable and had significant problems, as discussed above, and including, but not limited to:

      a.     Repeated instances of check engine lights illuminating;

      b.     Engine derating;

      c.     EGR system failure, including but not limited to:

          i.     EGR sensor failure;

          ii.     full replacement of the EGR valve and cooler system;

          iii.     cooling system failures causing the engine to overheat;

          iv.     other problems or failures specifically related to the EGR system;

          v.     EGR plugging;

          vi.     EGR cracking/leaking;

          vii.     EGR valve problems;

        viii.    Turbo failures; and

        ix.    Need for recalibration

  d.    Boost control solenoid failing;

  e.    Retarder control valve leaking;

  f.    Hoses and connections becoming clogged or prematurely worn;

  g.    Reduced fuel efficiency; and

  h.    Other issues that prevented the Trucks from functioning as warranted.

85.    Plaintiff relied on the above-described representations from Defendant in making its decision to purchase the Trucks.

86.    Plaintiff repeatedly notified Defendant of the defects related to the Trucks and their MaxxForce engines, but Defendant failed and/or refused to make repairs sufficient to correct the defects.

87.    As a proximate result of Defendant's breach of warranty, Plaintiff has suffered financial loss and other damages within the jurisdictional allowances of this Court, including, but not limited to:

  a.    Loss of profits;

  b.    Downtime expenses and losses;

  c.    Diminished resale value on the Trucks;

  d.    Out-of-pocket repair expenses;

  e.    Fuel expenses incurred in excess of the represented amounts;

  f.    Towing expenses;

  g.    Lodging expenses;

  h.    Rental car expenses, including fuel for same;

     i.      Unreimbursed driver downtime;

     j.      Loss of revenue; and

     k.     Other economic, financial, consequential and incidental damages allowed by law or equity.

## BREACH OF CONTRACT

88.     In addition, or in the alternative, Plaintiff brings a cause of action for breach of contract against Defendant in that Defendant failed to provide Trucks free from defects in accordance with the terms of the agreement.

89.     Plaintiff entered into a valid, enforceable contract with Rush, which is an agent of Defendant and is authorized to act on Defendant's behalf in selling International Trucks.

90.     The aforementioned contract obligated Plaintiff to buy and Defendant to provide the Trucks free from defects (the "Agreement").

91.     Plaintiff performed its contractual obligations by purchasing the Trucks.

92.     Defendant breached the Agreement by failing to provide Trucks that were free from defects in accordance with the terms of the Agreement.

93.     As a proximate result of Defendant's breach of the Agreement, Plaintiff has suffered financial loss and other damages within the jurisdictional allowances of this Court, including, but not limited to:

     a.     Loss of profits;

     b.     Downtime expenses and losses;

     c.     Diminished resale value on the Trucks;

     d.     Out-of-pocket repair expenses;

     e.     Fuel expenses incurred in excess of the represented amounts;

f.    Towing expenses;

g.    Lodging expenses;

h.    Rental car expenses, including fuel for same;

i.    Unreimbursed driver downtime;

j.    Loss of revenue; and

k.    Other economic, financial, consequential and incidental damages allowed
by law or equity.

## FRAUD

94.    In addition, or in the alternative, Plaintiff brings a cause of action for fraud against
Defendant for knowingly making false representations of material fact to Plaintiff in connection
with the purchase of the Trucks.  All previous paragraphs are incorporated as if fully set forth
herein in this section related to Plaintiff's cause of action of fraud.

95.    Upon information and belief, Defendant Navistar's agents provided Plaintiff with
false information regarding the Trucks, including by not limited to the Trucks' performance
capabilities, fuel economy, the effectiveness and durability of the Trucks' EGR system, the
Trucks' overall fitness for use, the adequacy of its pre-launch testing, the ability to meet 2010
EPA emissions certification with a commercially viable vehicle that would work in the "real
world," as well as representations revealed in discovery responses (the "Misrepresentations").

96.    Defendant Navistar's Misrepresentations included the following material
representations to Plaintiff, upon which Plaintiff relied in connection with the purchase of the
Trucks:

a.    The MaxxForce EGR system provides better "fluid economy" than other brands'
selective catalytic reduction (SCR) system;

b.      MaxxForce ProStars deliver the "lowest cost of ownership" including minimal downtime as a result of breakdowns of the engine and emissions systems;

c.      The Trucks were free from defects and was suitable to perform the duties for which they were manufactured and sold;

d.      Defendant offers an expansive network of MaxxForce ProStar certified technicians and quality parts that would be available to make repairs;

e.      All authorized dealers in Defendant's network have MaxxForce ProStar certified technicians on staff at all times;

f.      Defendant's OnCommand service reduces downtime by communicating with the dealer's repair department and scheduling parts, technicians, and suggested troubleshooting all before the Trucks even arrives at the mechanic's shop;

g.      MaxxForce ProStars and MaxxForce engines are built for performance, reliability, and durability;

h.      MaxxForce ProStars and MaxxForce engines are built to maximize uptime, minimize downtime and be "always performing";

i.      MaxxForce ProStars and MaxxForce engines had gone through a rigorous and acceptable level of testing involving millions of miles of actual road testing and years of simulated testing to provide road ready Trucks from the day of purchase and Navistar had worked out/resolved all major issues during testing prior to launching the 2010 model;

j.      The MaxxForce engines were EPA 2010 certified;

k.      The MaxxForce engines had met the .2g NOx emissions in a commercially viable truck and/or had no issues with meeting .2 NOx with a commercially viable vehicle that would operate in the "real world";

l.      The MaxxForce engines provided better fuel economy that its competitors; and

m.      The design of the EGR System to meet the 2010 regulations was "mature," "proven," and not a "new technology."

97.     Upon information and belief, Defendant Navistar knew that the Misrepresentations were false when they were made.

98.     Upon information and belief, the Misrepresentations were made by Defendant Navistar to their dealers, including Non-parties Interstate International, Gibbs International, Hanson International and Navistar UTC, with the intent that Non-parties Interstate International, Gibbs International, Hanson International and Navistar UTC would pass along the Misrepresentations to potential buyers, including the Plaintiff. These representations were also made directly by Navistar in advertising materials and public statements

99.     Navistar and Non-parties Interstate International, Gibbs International, Hanson International and Navistar UTC did, in fact, make the Misrepresentations to Plaintiff regarding the Trucks.

100.    Upon information and belief, the Misrepresentations were also made by Defendant Navistar to their dealers, Non-parties Interstate International, Gibbs International, Hanson International and Navistar UTC, with the intent that they would pass along the Misrepresentations to truck owners, including the Plaintiff, whose trucks were being repaired and service by dealers like Rush. Both Navistar and Non-parties Interstate International, Gibbs International, Hanson International and Navistar UTC knew of the falsity of these (mis)representations.

101.    Non-parties Interstate International, Gibbs International, Hanson International and Navistar UTC did, in fact, make the Misrepresentations to Plaintiff regarding the Trucks.

102.    If Plaintiff had known the true facts, Plaintiff would not have purchased any Trucks from Defendant and would not have continued to permit Defendant and Non-parties Interstate International, Gibbs International, Hanson International and Navistar UTC to work on and attempt to repair these defective engines all the while keeping Plaintiff's trucks out of service.

103.    At the time Defendant made the above-described Misrepresentations, Defendant knew the Misrepresentations were false and/or made the Misrepresentations recklessly, as positive assertions, without knowledge of their truth.

104.    Defendant made the above-described Misrepresentations with the intent that Plaintiff rely on the Misrepresentations in making the decision to purchase the Trucks, and thus fraudulently induced Plaintiff to purchase and lease the Trucks.

105.    Non-parties Interstate International, Gibbs International, Hanson International and Navistar UTC made the above-described Misrepresentations with the intent that Plaintiff rely on the Misrepresentations in making the decision to allow Non-parties Interstate International, Gibbs International, Hanson International and Navistar UTC to service and repair the Trucks.

106.    As a proximate result of Defendant's fraudulent Misrepresentations to Plaintiff, Plaintiff has suffered financial loss and other damages within the jurisdictional allowances of this Court, including, but not limited to:

    a.    Loss of profits;

    b.    Downtime expenses and losses;

    c.    Diminished resale value on the Trucks;

    d.    Out-of-pocket repair expenses;

    e.    Fuel expenses incurred in excess of the represented amounts;

f.      Towing expenses;

g.      Lodging expenses;

h.      Rental car expenses, including fuel for same;

i.      Unreimbursed driver downtime;

j.      Loss of revenue; and

k.      Other economic, financial, consequential, incidental and other

        damages allowed by law or equity.

### FRAUD BY NONDISCLOSURE

107.    In addition or in the alternative, Plaintiff brings a cause of action for fraud by nondisclosure against Defendant Navistar for withholding material information, otherwise unavailable to Plaintiff, necessary to correct the false impression created by Defendant. Plaintiff incorporates all prior paragraphs regarding representations and fraud committed by Navistar as if fully set forth herein in this section.

108.    Upon information and belief, Plaintiff asserts that Defendant knew that the MaxxForce engine with the EGR cooling system had inherent performance and reliability problems (the "Known Defects") at the time Plaintiff purchased the Trucks.

109.    Upon information and belief, Plaintiff asserts that Defendant Navistar knew as early as 2010 that the MaxxForce engine with the EGR cooling system would never meet the 2010 EPA .2g NOx emissions regulations, with the ability to operate in the real world.

110.    Upon information and belief, Plaintiff asserts that Defendant Navistar knew as early as 2008 that the MaxxForce engine with the EGR cooling system had severe technical problems that would lead to engine performance and quality issues, including heat, soot, and

condensation issues. These issues and problems continued to exist throughout the testing and into the launch of the truck.

111. Upon information and belief, Navistar knew its engine testing had been inadequate and truncated, late in starting, causing late design changes, immature designs and increased warrant risk. Navistar failed to reveal these things while making representations that it had conducted millions of miles of real world testing that had worked out all reliability, durability and quality issues with the engine and EGR system.

112. Upon information and belief, Defendant knew that Plaintiff was ignorant of the Known Defects associated with the MaxxForce ProStars.

113. Furthermore, Plaintiff did not have an equal opportunity to discover the Known Defects until after purchasing and leasing and operating the Trucks.

114. Upon information and belief, Defendant deliberately withheld the information about the Known Defects associated with the MaxxForce ProStars when they had a duty to disclose the information to Plaintiff.

115. By failing to disclose the Known Defects to Plaintiff Defendant Navistar induced Plaintiff to purchase the Trucks.

116. Plaintiff, relying on the Misrepresentations made by Defendant, purchased the Trucks.

117. By failing to disclose the Known Defects to Plaintiff, Non-parties Interstate International, Gibbs International, Hanson International and Navistar UTC induced Plaintiff to continue servicing and repairing the Trucks.

118.    As a proximate result of Defendant's fraud by nondisclosure, Plaintiff has suffered financial loss and other damages within the jurisdictional allowances of this Court, including, but not limited to:

    a.    Loss of profits;

    b.    Downtime expenses and losses;

    c.    Diminished resale value on the Trucks;

    d.    Out-of-pocket repair expenses;

    e.    Fuel expenses incurred in excess of the represented amounts;

    f.    Towing expenses;

    g.    Lodging expenses;

    h.    Rental car expenses, including fuel for same;

    i.    Unreimbursed driver downtime;

    j.    Loss of revenue; and

    k.    Other economic, financial, consequential, incidental and other damages allowed by law or equity.

## UNCONSCIONABILITY AND/OR FAILURE OF ESSENTIAL PURPOSE AS TO ALL WARRANTY DISCLAIMERS AND LIMITATIONS OF REMEDIES/DAMAGES

119.    Defendant's acts have rendered all exclusive or limited express warranties inapplicable because they have failed their essential purpose in that no amount of repair has been able to remedy the defects in Plaintiff's Trucks.  Moreover, any and all attempts to limit the damages and remedies available to Plaintiff in any agreement, Defendant's actions as expressed herein make all such attempted limitations unconscionable.

120. Specifically, Defendant's withholding of critical information, coupled with the inconspicuousness nature of any such attempted limitation, shows the unfairness which tainted the negotiation process between these parties. Defendant acted with deception, and used overreaching and sharp business practices. Additionally, Defendant acted in an unfair and grossly unfair manner as described herein, by failing to act with good faith as Defendant did not proceed with honesty in fact and the observance of reasonable commercial standards of fair dealing. This renders Defendant's attempted limitation of remedies and disclaimers void due to the unconscionability of the provisions when coupled with the acts/knowledge of the Defendant.

121. Plaintiff is entitled to recover all actual and economic damages, including all consequential and incidental damages listed herein, from Defendant because all exclusive or limited express warranties have failed in their essential purpose, and all attempted limitations of remedies/damages are unconscionable.

## INTEREST AND OTHER RELIEF

122. Plaintiff prays for recovery of pre- and post-judgment interest on their damages from Defendant, and/or on any amount awarded in judgment against Defendant, at the maximum allowable, lawful rates, together with recovery of Plaintiff's litigation costs and expenses from Defendant.

## CONDITIONS PRECEDENT

123. All conditions precedent to recovery have been complied with by Plaintiff.

## JURY DEMAND

124. Plaintiff hereby demands a trial by jury as to all claims in this action.

**WHEREFORE PREMISES CONSIDERED,** Plaintiff prays that Defendant be cited to appear and answer this lawsuit and further pray that after final trial or hearing of this matter, the Court award Plaintiff the following categories of damages against Defendant:

(i)      Actual damages;

(ii)     Loss of profits;

(iii)    Downtime expenses and losses;

(iv)    Diminished resale value on the Trucks;

(v)     Out-of-pocket repair expenses;

(vi)    Fuel expenses incurred in excess of the represented amounts;

(vii)   Towing expenses;

(viii)  Lodging expenses;

(ix)    Rental car expenses, including fuel for same;

(x)     Unreimbursed driver downtime;

(xi)    Loss of revenue;

(xii)   Other economic, financial, consequential and incidental damages allowed by law or equity;

(xiii)  Pre and post-judgment interest;

(xiv)  Costs of court;

(xv)   Reasonable attorneys' fees;

(xvi)  Complete dismissal of all claims of Defendant against Plaintiff, with no award given to Defendant; and

(xvii) Such other and further relief to which Plaintiff may show itself to be justly entitled at law or in equity.

Respectfully submitted,

**MILLER WEISBROD, LLP**
11551 Forest Central Drive
Forest Central II, Suite 300
P. O. Box 821329 (75382)
Dallas, Texas 75243
(214) 987-0005
(214) 987-2545 (Facsimile)


BY: /s/ Warren M. Armstrong
**CLAY MILLER**
cmiller@millerweisbrod.com
Texas State Bar No. 00791266
**WARREN M. ARMSTRONG**
warmstrong@millerweisbrod.com
Texas State Bar No. 24044432

Date: September 16, 2015          **ATTORNEYS FOR PLAINTIFF**